Filed 4/1/21  In re L.C. CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| In re L.C., et al., Persons Coming Under the Juvenile Court Law. | |
| | G059421 |
| ORANGE COUNTY SOCIAL SERVICES AGENCY, | (Super. Ct. Nos. 18DP0018 & 18DP0019) |
| Plaintiff and Respondent, | O P I N I O N |
| v. | |
| J.W., | |
| Defendant and Appellant. | |

Appeal from orders of the Superior Court of Orange County, Dennis J. Keough, Judge.  Affirmed.

Suzanne Davidson, under appointment by the Court of Appeal, for Defendant and Appellant.

Leon J. Page, County Counsel, Karen L. Christensen and Aurelio Torre, Deputy County Counsel, for Plaintiff and Respondent.

No appearances for the Minors.

\*          \*          \*

Jennifer W. (Mother) appeals an order terminating her parental rights, arguing the juvenile court erred by not applying the parental benefit exception to avoid the termination. (Welf. and Inst. Code, § 366.26, subd.(c)(1)(B)(i); all further statutory references are to the Welfare and Institutions Code.)  We discern no error and affirm the court's order.

I

FACTS AND PROCEDURAL HISTORY

*A. The Minors' Juvenile Court Dependency*

In January 2018, the juvenile court detained Mother's two children, then two-year-old L.C. and one-year-old A.C., after they were found unsupervised with open wounds, severe rashes, and an infection caused by leaving the children in urine-soaked diapers.  Mother acknowledged domestic violence between her and the children's father and with Mother's previous partner.  The Orange County Social Services Agency (SSA) took the children into protective custody and filed a dependency petition, alleging both Mother and the children's father had failed to provide for the children's basic needs.  The following month, SSA placed the children together with the same foster parents.

Mother's petition alleged she "ha[d] a history of substance abuse," including methamphetamine, that was "an unresolved problem."  The petition specified that "multiple paternal family members who resided with the mother and the [] father . . . suspected that both parents were abusing drugs."  The father of Mother's older child, L.C. and A.C.'s older half-sibling, "reported that [M]other had an extensive history of methamphetamine abuse."  Five months after the petition was filed, Mother, then 28 years old, claimed drug testing was unnecessary and that she had not used drugs since her adolescence. The juvenile court found the allegations in SSA's petition to be true.

In its June 2018 dispositional order, the juvenile court continued L.C. and A.C.'s placements with their foster parents, and authorized SSA to provide family reunification services for Mother based on a case plan she agreed to follow a week after

2

SSA detained the children. Under the plan, Mother would continue her supervised visits with the children, but SSA was given the authority to liberalize visitation. Mother agreed to participate in a parenting class, anger management, and random drug testing, where "all drug [and] alcohol tests [were] to be negative" and a missed drug test would be considered a positive drug test. At the time, Mother had missed at least nine visits with L.C. and A.C., had not reported for drug testing, and confronted the children's foster mother about the contents of SSA's reports to the court.

Four months later, Mother gave birth to M.C., who was born with amphetamine and methamphetamine in her blood system. Mother tested negative and denied using drugs. SSA took M.C. into protective custody and placed the child in the same foster family as L.C. and A.C. [1] Before the juvenile court's six month review hearing, SSA conducted a Child and Family Team meeting with social workers, the children's foster parents, and Mother, who began participating in drug patch testing.

Nine months later, in August 2019, the juvenile court terminated reunification services for Mother. The court found SSA had offered Mother reasonable services. Although her participation had been moderate, in the four months leading up to court's ruling, Mother tested positive for drug use four times—three times for opiates and once for both opiates and methamphetamines—and on three other occasions failed to provide patches that could be tested. The court noted when Mother failed to explain the first positive test result, SSA cancelled its plan to liberalize Mother's visitation with her children to unsupervised visits. The court set a hearing under section 366.26 to determine a permanent plan for L.C. and A.C. (.26 hearing).

---

[1] We focus on children L.C. and A.C. and do not discuss facts about M.C. that are not material to our disposition. Nor do we discuss the children's father's involvement in this case, unless material to Mother's claims. The court later terminated his access to family reunification services and he is not a party to this appeal.

3

*B. The .26 Hearing*

SSA senior social worker Emmanuel Rodriguez filed a report ahead of the .26 hearing recommending the juvenile court find the children adoptable and terminate Mother's parental rights. On the children's prospective adoption placement, the report noted L.C. and A.C., then nearly four and three years old, had been living with their foster parents and now the prospective adoptive parents for the past 21 months and had bonded with the parents, who "welcomed and incorporated the[] children into their family life and routine." SSA reported the children were "doing well" and "appear[ed] comfortable" in the home, and went to "their [prospective adoptive] parents for their needs." SSA reported L.C. "expressed that she enjoy[ed] living with [the] parents," who "demonstrated their commitment to [] care [for the] well-being of the children and . . . [were] willing to provide permanency for the children through [] adoption." In supplemental reports spanning nine months leading up to the .26 hearing, SSA reported the children were "continu[ing] to do great and thriv[ing]" in their prospective adoption home.

The juvenile court conducted its .26 hearing for L.C. and A.C. together with its status review for M.C., over several days beginning at the end of August 2020. The court received into evidence social worker Rodriguez's .26 hearing report and its six supplemental reports. It also heard testimony from Mother and Rodriguez.

1. Rodriguez's Testimony

Rodriguez testified the last visit he personally had observed between Mother and her children occurred in March 2020, just before the COVID-19 pandemic began. Rodriguez recalled Mother brought food to her children and changed their diapers, and he had "no concerns" about her visits, which he believed were consistent and positive for the children. Rodriguez recalled the children hugged and kissed Mother, stated they loved her, and shared a "really strong bond" with her.

Rodriguez confirmed the recommendation in his initial .26 report to

4

terminate Mother's parental rights. He did not believe termination would be detrimental to either L.C. or A.C. based on the children's ages and other factors, including how long they had been with their prospective adoptive parents, the Mother's lack of progress in following her case plan, and her visits with the children. Rodriguez testified the children referred to both Mother and their prospective adoptive parents as their parents and, although the children called Mother "Mommy," L.C. once referred to Mother by her legal name, which Mother redirected. Rodriguez did not recall any direct observation or report that either L.C. or A.C. expressed sadness or cried at the end of Mother's visits.

Rodriguez testified his permanent plan recommendation included "balanc[ing] . . . [the value of] permanency for [L.C. and A.C.] with maintaining a relationship with [Mother]." Rodriguez agreed that, in general, children could experience trauma when learning they would no longer see their biological parent, but disagreed that this would happen to L.C. or A.C. Rodriguez testified Mother had not been responsible for the children's "day-to-day" care during the entire dependency and reasoned that, although L.C. had a "really strong bond" with Mother, the child also shared a "very strong" bond with her prospective adoptive parents, who the child considered "mom and dad and family." For the younger child, A.C., Rodriguez added the prospective adoptive father taught the child how to ride a tricycle and currently was teaching her how to swim. Rodriguez testified that in every compliance visit with the parents, he observed the children display affection toward the parents and appeared "very comfortable in the household."

Rodriguez further explained his recommendation was partly based on Mother's failure to progress with her case plan on drug use. Rodriguez confirmed Mother had been advised that if she used drugs SSA would not liberalize visits with her children, and noted SSA canceled a 2019 plan to liberalize visitation from unsupervised to supervised visits because of Mother's positive drug test results. Rodriguez testified Mother had not complied with her case plan solely because of her drug use, which she

5

continued to deny.

### 2. Mother's Testimony

Mother testified that when she visited her children she "provide[d] everything as far as diapers, food, snacks, [and] toys." On parenting, Mother testified she "correct[ed]" and "redirect[ed] them to do the right thing." She also asserted L.C. and A.C. expressed their desire to remain with Mother at the end of their visits and that L.C. cried when leaving.

Mother testified she had benefited from the reunification services SSA offered, and discussed programs she completed. She identified topics she studied, such as substance abuse, "different forms of parenting," "emotional reasoning," "toxic relationships," and "trauma." She learned the importance of having a support system, and testified she had one, especially through her family.

On drug use, Mother claimed she "ha[d] been sober since . . . [October 2018], three days before [M.C.] was born." Mother claimed she had acknowledged and admitted using methamphetamine around the time of M.C.'s birth, but upon further questioning conceded she had denied using drugs when confronted by authorities. Mother claimed she never had failed to submit her drug patches for testing and asserted every positive test result was "an error." Mother testified a possible explanation for positive results was environmental residue, but also maintained she had not been exposed to any environment containing methamphetamine. When she explained she earlier had chosen to leave a residential shelter to accommodate unsupervised visits with her children, she was asked why the unsupervised visits did not materialize. Mother first responded "[i]t was unclear at the time," but then confirmed it was because she incurred a positive drug test result "[f]or heroin, . . . a substance that [she had] never touched in [her] life."

### 3. Juvenile Court Ruling

During oral arguments, Mother argued the juvenile court should not

6

terminate her parental rights to L.C. and A.C. based on the parental benefit exception. She argued Rodriguez's opinion testimony that termination would not be detrimental to the children lacked credibility and that Mother had an "incredibly beneficial and positive relationship" with the children. Counsel for L.C. and A.C. noted Mother loved her children, but asserted she had not met her burden to show the exception applied because her positive visits with the children were "more akin to [visits from a] friendly visitor or a playmate." The children's counsel agreed with Rodriguez's testimony and argued the benefit of a continuing Mother's relationship with the children did not "outweigh[] the detriment to permanency" posed by ordering an exception to adoption. SSA argued that although there were benefits to Mother's relationship with the children, "frequent and loving contacts [were] insufficient" to justify applying the exception. SSA emphasized Mother's failure to reunify with the children as a "huge barrier to Mother occupying more of a parental role," which the children's foster parents had fulfilled for two years by the time of the hearing.

The juvenile court found the children adoptable and balanced "the strengths and qualities of [Mother's] relationship [with L.C. and A.C.] . . . against the security that the sense of belonging [] to a new family would confer . . . from [L.C. and A.C.'s] point of view." The court ruled Mother had failed to carry her burden to justify applying the parental benefit exception under the "standards articulated in [*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575 (*Autumn H.*)] and its progeny." The court considered when the children were detained (when L.C. had been just over two years old and A.C. just over one year old), how long they had been out of Mother's custody (31 months at the time of the .26 hearing) and Mother's progress status on her "core issue" of substance abuse. The court noted the focus at this hearing shifted from attempting to reunify Mother with her children to the children's best interests when reunification services were terminated in August 2019. Although Mother's visits had been consistent and "positive" for the children, the court concluded that under *Autumn H.*, Mother had not shown her

"relationship promote[d] the well-being of the child[ren] to such a degree [it] outweigh[ed] the well-being [they] would gain in a permanent home with new adoptive parents."

The juvenile court found Rodriguez's testimony "credible" and added it independently came to the same conclusion that adoption best served the children's interests. The court terminated Mother parental rights to L.C. and A.C. and ordered a permanent plan of adoption for the children.

## II

### DISCUSSION

*A. Standard of Review*

Mother contends the juvenile court should have applied the statutory "parental benefit exception" and not terminated her parental rights for L.C. and A.C. Although she acknowledges the Legislature's express preference for adoption (§ 366.26, subd. (b)(1))—and consequently, termination of parental rights (*In re Breanna S.* (2017) 8 Cal.App.5th 636, 645 (*Breanna S.*))—Mother asserts she showed "a compelling reason for determining that termination would be detrimental to the child[ren]" because she "had maintained regular visitation and contact with the child[ren,] and [showed they] would benefit from continuing the[ir] relationship [with her]." (§ 366.26, subd. (c)(1)(B)(i).)

As SSA notes, the California Supreme Court will soon resolve a disagreement among appellate courts about how to analyze a juvenile court order on the parental benefit exception. (See *In re Caden C.* (2019) 34 Cal.App.5th 87, review granted July 24, 2019, S255839.) Some courts review the decision for abuse of discretion, others review it for substantial evidence, and still others combine the two. (See *id.* at p. 106.) We agree with the parties the hybrid approach is appropriate. In other words, we review factual determinations for substantial evidence, but the juvenile court's decision on the importance of parent-child relationship weighed against the benefit of adoption is reviewed under the deferential abuse of discretion standard. (*In re J.C.*

8

(2014) 226 Cal.App.4th 503, 530.) We also note we would reach the same conclusion whether we analyzed Mother's arguments solely under the substantial evidence or abuse of discretion standard of review.

The benefit exception authorizes the juvenile court to avoid terminating parental rights if it finds "'termination would be detrimental to the child [because] . . . [t]he parents or guardians have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship.'" (*In re Cliffton B.* (2000) 81 Cal.App.4th 415, 424.) Once a parent fails to reunify with a child during the prescribed statutory period and the juvenile court terminates reunification services, the parent bears the burden of proving termination of parental rights would be detrimental to the child. (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1350 (*Jasmine D.*).) The benefit exception does not permit a parent to thwart the permanency and stability of adoption merely by showing the child would derive some benefit from continuing a relationship maintained during periods of visitation with the parent. (*Id.* at p. 1348.) Instead, the benefit exception applies only if "the relationship promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents." (*In re Autumn H., supra,* 27 Cal.App.4th at p. 575.)

*Autumn H.* explains the requisite analytical framework: "[T]he court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.) Thus, "the juvenile court must engage in a

9

balancing test, juxtaposing the quality of the relationship and the detriment involved in terminating it against the potential benefit of an adoptive family." (*In re Cliffton B.*, *supra*, 81 Cal.App.4th at pp. 424-425.) Factors bearing on the parent-child bond include "[t]he age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs . . . ." (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 576.)

Even if these factors reveal a strong bond, the parent faces a heavy burden to overcome the Legislature's preferred permanent plan of adoption. (See § 366.26, subd. (b)(1) [identifying adoption as preferred plan]; see also *Jasmine D.*, *supra*, 78 Cal.App.4th at p. 1348 ["Adoption is the Legislature's first choice because it gives the child the best chance at [a full emotional] commitment from a responsible caretaker"]; *In re Beatrice M.* (1994) 29 Cal.App.4th 1411, 1419 [the "most permanent and secure alternative" of adoption affords children "the best possible opportunity to get on with the task of growing up"].) Stability and permanence become paramount goals once reunification efforts cease. (*In re Marilyn H.* (1993) 5 Cal.4th 295, 309.) By the section 366.26 hearing, the dependent child "is entitled to stability now, not at some hypothetical point in the future." (*In re Megan S.* (2002) 104 Cal.App.4th 247, 254.) Thus, the statutory exceptions to termination, including the benefit exception, "merely permit the court, *in exceptional circumstances* [citation], to choose an option other than the norm, which remains adoption." (*In re Celine R.* (2003) 31 Cal.4th 45, 53, original italics.) We must affirm the juvenile court's conclusion the benefit exception did not apply if substantial evidence supports the juvenile court's discretionary determination order. (*In re J.C.*, *supra*, 226 Cal.App.4th at pp. 530-531.)

*B. The Juvenile Court Did Not Err in Rejecting the Parental Benefit Exception*

Given there is a no dispute that Mother satisfied the visitation prong, we consider whether the juvenile court erred by not applying the parental benefit exception based on the "nature of [Mother's] relationship" with L.C. and A.C. Mother contends she "occupied a parental role" and "share[d] a strong attachment" with L.C. and A.C. that overcame the legislative preference for adoption. We do not find the contention persuasive. Rodriguez acknowledged the positive nature of Mother's visits with her children, but he also did not believe terminating visitation would adversely affect the children, explaining the children were not sad or upset at the end of their visits with mother. The evidence also showed the children bonded with their prospective adoptive parents and were thriving in their care. Rodriguez's testimony, which the court found credible, and evidence the children stood to greatly benefit in a permanent home, constitutes substantial evidence and supports the court's decision not to apply the benefit exception.

Mother's reliance on *In re S.B.* (2008) 164 Cal.App.4th 289 (*S.B.*) is unavailing. There, an appellate court reversed an order terminating the parental rights of a father who had been the primary caregiver for the first three years of his then five-year-old daughter's life. (*Id*. at pp. 293, 295, 303.) Following the father's "drug-related" arrest (*Id*. at p. 293), he had "'complied with every aspect of his case plan,' including maintaining his sobriety," by the time of the court's 12-month review hearing. (*Ibid*.)

The appellate court reversed the juvenile court's termination of parental rights (*S.B.*, *supra*, 164 Cal.App.4th at p. 303), explaining the record showed the father had "continued the significant parent-child relationship *despite* the lack of day-to-day contact with [his daughter] after she was removed from his care." (*Id*. at p. 299.) The appellate court reasoned that, based on a record showing the daughter "loved her father, wanted their relationship to continue and derived some measure of benefit from his visits . . . the only reasonable inference [was the daughter] would be greatly harmed by the loss

11

of her significant, positive relationship with" her father. (*Id*. at pp. 300-301.)  The court observed the parental beneficial relationship exception does not require "proof that the child has a 'primary attachment' to a parent or that the noncustodial parent has maintained day-to-day contact with the child ." (*Id*. at p. 300.)

The factual contrast to the record here underscores the absence of error in the juvenile court's ruling.  As a *general* proposition, Mother correctly asserts that a child's bond with prospective adoptive parents does not necessarily mean the child cannot "continue to also have a bond with [a biological parent]."  But we disagree with Mother's claim "[t]he benefits of continuing the children's very strong bond with [her] outweighed the benefits of adoption."  In contrast to the father in *S.B.*, Mother did not have physical custody of L.C. and A.C. for the majority of their lives—since they had been two years and one year old, respectively.  Nor is it clear Mother had been the primary caregiver before SSA detained the children.  Unlike the father in *S.B.*, the record does not show Mother "'complied with every aspect of [her] case plan,' including maintaining [her] sobriety." (*S.B.*, *supra*, 164 Cal.App.4th at p. 293.)  Indeed, Rodriguez testified, and Mother confirmed, she failed to progress to unsupervised visits with the children because of her positive drug test results.  (See *In re Casey D.* (1999) 70 Cal.App.4th 38, 51 [showing of a sufficiently "strong and beneficial parent-child relationship . . . difficult to make" where parent fails to qualify for unsupervised visitation].)

We do not discount the relationship between Mother and her children, nor her efforts to address the issues that brought her to the juvenile court.  It is clear Mother loves her children.  Notwithstanding, the record shows, and Mother does not dispute, the children had a strong bond with their prospective adoptive parents and considered them their parents.  Given that adoption is the legislatively preferred permanent plan for adoptable dependent children, and the benefit exception expressly requires a "compelling reason [to] determin[e] that termination [of Mother's parental rights] would be

12

detrimental to the child[ren]" (§ 366.26, subd. (c)(1)(B)(i)), the court did not err in declining to apply the parental benefit exception.

III

DISPOSITION

The juvenile court's order terminating Mother's parental rights for L.C. and A.C. is affirmed.


ARONSON, J.

WE CONCUR:


BEDSWORTH, ACTING P. J.


FYBEL, J.

13